Debra KEACH and Patricia Sage, Plaintiffs,

v.

U.S. TRUST COMPANY, N.A., et al., Defendants.

No. 01–1168.

United States District Court, C.D. Illinois.

March 5, 2003.

Dean B. Rhoads, Robert Rhode, Edward Sutkowski, Steven Oates, Sean Anderson, Sutkowski & Rhoads, Peoria, IL, for Plaintiffs Debra Keach and Patricia Sage.

Timothy Bertschy, Heyl, Royster, Voelker & Allen, Peoria, IL, Robert Eccles, Shannon M. Barrett, O'Melveny & Myers, LLP, Washington, DC, for Defendant U.S. Trust Company, NA.

Charles Roth, James Springer, Joseph Z. Sudow, Kavanagh, Scully, Sudow, White & Frederick, Peoria, IL, Michael T. Graham, Nancy Ross, McDermott, Will & Emery, Chicago, IL, Trent P. Cornell Duane Morris, LLC, Chicago, IL, for Defendant Ellen D. Foster.

Michael T. Graham, Nancy Ross, McDermott, Will & Emery, Chicago, IL, for Northern Trust Co.

Richard J. Pautler, Jennifer Baetje, Thompson & Coburn, St. Louis, MO, for Defendants Robert A. Ostertag, Jr., Terry P. Cole, Alan R. Dix, Jon Elletson and A. Robert Pellegrino.

James Bailey, Paul Ondrasik, Jr., Steptoe & Johnson, Washington, DC, Roy Davis, David Lubben, Davis & Campbell, LLC, Peoria, IL, for Defendants Valuemetrics, Inc.

Mark Casciari, Ian Hugh Morrison, Sari M. Alamuddin, Seyfarth Shaw, Chicago, IL, for Defendant Houlihan, Lokey, Howard & Zukin, Inc.

Stephen Gay, Jeffrey Alan Ryva, Husch & Eppenberger, LLC, Peoria, IL, for Defendant Lyle Dickes.

Jeffrey Rock, Hasselberg, Rock, Bell & Kuppler, Peoria, IL, for Defendants James Freid and Richard Hodgson.

John Elias, Robert Riffle, Cynthia Elias, Elias, Meginnes, Riffle & Seghetti, Peoria, IL, for Defendants William Gehring, Henry Gregory, II, John F. Halpin, James Kyle, John Lappegaard, George Mckittrick, Clayton Patino, Jerry Rathmann, W. Thomas Stumb, Mark Swedlund, Leo Vanderlugt, Robert Wilson and Bruce Wright.

Dean Essig, Washington, IL, for Defendant Gregory McAllister.

Charles Roth, James Springer, Joseph Z. Sudow, Kavanagh, Scully, Sudow, White & Frederick, Peoria, IL, for Michael Norbutas, Frederick Stuber., Melvyn Regal.

### ORDER

MICHAEL M. MIHM, District Judge.

Now before the Court is a Motion for Summary Judgment by Defendants Stephen Bartley ("Bartley"), Michael Norbutas ("Norbutas"), and Frederick Stuber ("Stuber"). For the reasons set forth below, the Motion for Summary Judgment [# 416] is GRANTED IN PART and DENIED IN PART.

### FACTUAL BACKGROUND

The basic factual background has been sufficiently set forth in the prior orders of

this Court, and familiarity therewith is presumed. The present motion is brought by Defendants Bartley, Norbutas, and Stuber, who are in this suit solely as parties-in-interest in Count IX of the First Amended Complaint. Bartley was Corporate Controller for F & G until 1998, when he became the Vice President of Finance, and Stuber was the Senior Vice President of Finance and Secretary through September 1996. Norbutas was F & G's Treasurer from 1985 through December 1996 and had been at some point prior to the 1995 transaction a member of the F & G ESOP Administrative Committee. The matter is now fully briefed and ready for resolution. This Order follows.

## DISCUSSION

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cain v. Lane*, 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir.1989). Summary judgment will be denied where a reasonable fact-finder could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995).

Bartley, Norbutas, and Stuber (hereinafter the "Bartley Defendants") are in this case solely as non-fiduciary parties-in-interest pursuant to § 406(a) of ERISA, which prohibits a "sale or exchange . . . of any property between the plan and a party in interest," and also prohibits a "transfer to . . . a party in interest . . . of any assets of the plan." 29 U.S.C. § 1106(a)(1)(A) and (D). ERISA further defines a "party in interest" to include any fiduciary, person providing services to the plan, an employer, an employee/officer/director or 10% shareholder of an employer, or any relative of these individuals. 29 U.S.C. § 1002(14). There is no dispute that the Bartley Defendants qualify as parties in interest with respect to the stock purchase transactions.

As the Court has previously held and hereby incorporates by reference, once Plaintiffs establish that the purchases of stock by the ESOP constituted a prohibited transaction under § 406, § 502(a)(3) then provides a right of action to seek appropriate equitable relief from parties in interest to redress the violation. *Harris Trust*, 120 S.Ct. at 2188, *citing*

§ 502(*l*)(1)(B). Borrowing from the law of trusts, the Defendants can then invoke the substantive equivalent of a modified bona fide purchaser defense by establishing that they gave value for the trust property. If the Defendants are able to make such a showing, a presumption of good faith attaches, and the burden shifts back to the Plaintiffs to establish that Defendants acted in bad faith or had actual or constructive notice of the circumstances that rendered the transaction unlawful.

Plaintiffs have conceded that at least for purposes of these motions, they do not contest that the stock purchase transactions were for "value" in the sense that they were not gratuitous but rather involved consideration that was more than nominal. Accordingly, the Bartley Defendants are entitled to a presumption of good faith and lack of knowledge unless Plaintiffs are able to rebut that presumption.

### I. *Defendant Stuber*

■ With respect to Stuber, the record reflects a genuine issue of material fact requiring resolution at trial. Although he was not a fiduciary to the ESOP, he was a corporate officer. As Secretary of F & G, Stuber regularly attended F & G Board meetings. He was therefore in a position that afforded him access to much of the same information that was available to the plan fiduciaries; in fact, a large number of the potentially relevant documents in the record were either drafted by, received by, or copied to Stuber. The record indicates that he had access to discussions and presentations to the Board in contemplation of the 1995 transaction and internal memoranda regarding that transaction, as well as the litigation reports presented and discussed at Board meetings, including an October 26, 1995, report disclosing that MBC had received inquiries from attorneys general offices in three states over the previous two weeks and that a fourth inquiry remained pending. Stuber reviewed many of the Valuemetrics reports regarding the stock purchase transaction and would also have had access to information regarding alleged conflicts of interest on the part of Foster, Regal, and Valuemetrics.

Stuber has presented an Affidavit indicating: (1) F & G provided Houlihan Lokey with all of the information it requested; (2) BA Securities did its own due diligence in connection with placing the loans for the 1995 ESOP with institutional lenders; (3) F & G's future revenue and expense projections were reviewed by its finance department to ensure that they were realistic; (4) he believes that the attorney from the Sonnenschein firm was provided with everything he requested during the due diligence process; (5) he never saw any case of dishonesty, concealment, unreasonable forecasting, or negligence in connection with the 1995 transaction; (6) he believes that the financial data supplied by F & G was accurate; (7) he knew that the firms involved in the transaction had excellent reputations; (8) he declined to redeem shares of F & G stock in 1998 for $20.33 per share because he believed that the shares would continue to increase in value; and (9) he was aware that there were occasional complaints from customers and inquiries from one or more states attorneys general but did not regard them as being material or threatening the financial well-being of F & G.

However, Plaintiffs have also introduced evidence, which when construed in the light most favorable to Plaintiffs as the non-moving party and drawing reasonable inferences therefrom, could support the conclusion that Stuber had constructive knowledge of circumstances that rendered his reliance on the determinations of the hired experts unreasonable and should have placed him on notice that the transac-

tion could be unlawful. As the Court has previously held in this case, questions of this nature are plainly issues of fact involving assessments of credibility to be resolved at trial. Accordingly, the Motion for Summary Judgment must be denied as to Stuber.

## II. *Defendant Norbutas*

The record with respect to Norbutas is as follows: At some point prior to 1995, he had been a member of the ESOP Administrative Committee and would therefore presumably have had some specific knowledge with respect to ERISA issues. On December 9, 1994, Norbutas drafted a memorandum to Tom Foster, in which he stated:

> In order to stir the ESOP II cauldron a little more, I offer the following: ... I question that any "control premium" is appropriate in ESOP II because the Trustee passes through the vote to participants. Since ESOP shares are not voted as a block, where does "control" come from? I don't think $21/share value is likely. Although I cannot yet support it mathematically, I believe $18/share is possible.... I estimate that the adverse price impact of $36 million new ESOP (i.e. deductible) debt may be about $2.50/share.... Lastly, and with some reservation, let me mention that there appears to be a $20 million error in the 1988 pre-ESOP valuation calculation. It's hard to believe—given the number of people that reviewed Valuemetric's work. If true, the ESOP overpaid by about $1.85/share....

This memorandum was also copied to Melvin Regal, Robert Pellegrino, Lyle Dickes ("Dickes"), Stuber, and Attorney Joe Sudow. Norbutas testified that no one ever followed up with him about the error he had identified in Valuemetrics' 1988 ESOP evaluation. Shortly thereafter, Norbutas drafted a series of questions for Valuemetrics related to the preferred way of recording expenditures and other actions that could be taken to maximize share value for purposes of a second ESOP transaction; Valuemetrics responded to each of these questions in writing. During this time frame, Norbutas also saw written communications between F & G and Valuemetrics concerning several possibilities for acquiring new owners for F & G stock, which ranged from an initial public offering, to a sale to a single purchaser, to various proposals involving the ESOP. By spring of 1995, he knew that an ESOP transaction was being favored over other possibilities and saw some of the reports and letters that went back and forth.

In June 1995, Norbutas wrote to Stuber and others proposing that F & G could generate over $6 million in cash that year by taking advantage of a tax deduction for the "spread between the estimated $20 ESOP price and $5.39 in the case of EIP shareholders or $4.25 in the case of EIP optionees." He followed up on that letter in July 1995 to report that by his calculations F & G would have approximately $14.4 million in cash as a result of the proposed transaction. He requested an opinion from Price Waterhouse, which he received on the day before the 1995 transaction was consummated. Norbutas also admits being aware of a memorandum circulated by Attorney Joe Sudow in July 1995 regarding possible conflicts of interest on the part of Foster and Regal in connection with the transaction.

Norbutas attended the 1995 Summer Leadership Meeting during which the proposed ESOP transaction was discussed, received the August 25, 1995, confidential interoffice memorandum from Dickes discussing due diligence, and also received the November 10, 1995, Confidential Disclosure Memorandum prepared for the benefit of the selling shareholders. At the November 14, 1995, meeting at the Coun-

try Club, Norbutas gave a presentation to review the changes from the first ESOP in 1988 to the proposed 1995 ESOP transaction and, along with Bartley, explained the financial implications of the transaction to the participants. On November 29, 1995, he received a confidential memorandum from Regal noting the decline in the market values of most publicly traded direct marketing companies and indicating that this had influenced the decision process of U.S. Trust and Houlihan Lokey in negotiating the purchase price for the 1995 transaction. Norbutas received Valuemetrics' Confidential Transaction Memorandum and then signed the Stock Purchase Agreement containing the same representations that have been addressed in previous Orders.

Norbutas has submitted an affidavit indicating that: (1) he personally provided some financial information to Valuemetrics during the planning stages for the 1995 ESOP transaction; (2) he discussed Valuemetrics' reports with Brad VanHorn of Valuemetrics; (3) he believed that Valuemetrics was being given correct information regarding the financial condition of F & G and its subsidiaries; and (4) he was generally familiar with the fact that there had been occasional customer complaints or inquiries from attorneys general regarding sweepstakes but he believed that they were inconsequential.

■ Although the Court has previously found and again finds that the general information received by many shareholders prior to the 1995 transaction was not enough to establish constructive knowledge of a breach of trust, the additional evidence specific to Norbutas, when construed in the light most favorable to

Plaintiffs and drawing reasonable inferences therefrom, could be interpreted as calling into question both the state of his knowledge and the reasonableness of his reliance on the professionals who structured/approved the transactions. Accordingly, as the issue of Norbutas' knowledge involves questions of credibility that cannot be resolved prior to trial, Plaintiffs have met their burden of presenting a genuine issue of material fact on the question of Norbutas' constructive knowledge of impropriety sufficient to survive summary judgment.[1]

### III. *Defendant Bartley*

■ Bartley's knowledge presents a close question. He was involved in the due diligence inquiry when MBC was acquired in 1992 and received a copy of Dickes' July 14, 1992, and August 4, 1992, memoranda. Again, however, the one line reference to "[i]ncreased state regulation of sweepstakes—first round winner" is nonprobative, particularly as Bartley explained the context of the conversations that he had on this subject in his deposition. Plaintiffs note that Bartley specifically recalled conversations on the subject of the threat posed to MBC's business due to its dependency on sweepstakes and governmental regulations. However, his deposition reveals that such conversations were only in the context of a concern that if different states implemented different regulations, it could increase MBC's cost of doing business "because one piece that would be acceptable in one state might have to be different in another state, and it could raise the cost of our mailings." (Bartley Dep. at 17.) This is quite different from the context suggested by Plain-

---

1. Plaintiffs again assert the same imputed knowledge theory based on Norbutas' appointment of Stuber to act as his representative for purposes of attending the closing on the 1995 transaction that they have previously asserted with respect to the other Defendants in this action. For the same reasons as have been stated in the prior Orders of the Court, this theory is likewise rejected with respect to the attempt to impute knowledge to Norbutas.

tiffs. In fact, over the next two pages of his deposition, Bartley expressly denied ever having seen any consumer complaints regarding MBC's sweepstakes, letters from state attorneys general making inquiries regarding MBC's sweepstakes, or copies of any lawsuits filed against MBC relating to its sweepstakes. (Bartley Dep. at 18–19.)

Bartley also received F & G's Business Unit Assessments and 1994 Budget Narratives, as well as MBC's 1996–1998 Strategic Plan. However, all these documents indicate is that dependency on sweeps and governmental regulation, among other things, were possible threats to the business for which corrective actions were planned in the near and long term to develop alternate promotional concepts and reduce dependency on sweeps.

Beginning in January 1995, he represented F & G in communications and meetings with Valuemetrics concerning various possibilities of acquiring new owners for the company and reviewed several of the reports that were prepared. He provided them with historical financial data, as well as five-year projections that had been prepared by the management of F & G and each of its subsidiaries and audited financial statements prepared by Price Waterhouse. There is nothing in the record to suggest that problems with sweepstakes marketing or investigations by attorneys general were ever discussed

in any of these communications or that Bartley had reason to know of such information but nevertheless withheld it from Valuemetrics.[2] Two weeks before the 1995 stock purchase transaction, Bartley sent Valuemetrics a letter transmitting corrections to the Confidential Transaction Memorandum with a cover letter that stated in relevant part:

Attached are most of the changes needed to reflect the transaction price of $19.50 per share. I'm still working on pages A–6 through A–8 and will get them to you late this morning. Now for the bad news ... Lyle would like you guys to turn this around as fast as possible. Apparently, the Trustee is going to want to see the finished product. Lyle wants us to review a faxed copy prior to any final issuance. Now for the worse news ... the Trustee is starting to question the plan for Tom and Mel to buy the KIC shares at $13.25 per share.[3] We can't change anything yet but another urgent request may be forthcoming. Bah humbug.

(Plaintiffs' Exhibit 708.) When read in the context of the attachments, this statement reflects little more than an apologetic tone for transmitting revisions to the figures contained in the memorandum and the possibility that more revisions were to come in light of U.S. Trust's involvement.

Like Norbutas, Bartley attended the 1995 Summer Leadership Meeting during

**2.** To the contrary, the only evidence indicating that Bartley had any awareness of sweepstakes issues is the same general information that the Court has repeatedly found to be nonprobative, and the sole evidence indicating his notice of an attorney general inquiry is the February 22, 1995, letter from Attorney Awerdick discussed in the following pages of this Order.

**3.** Although it is not clear from the context of this quote, the reference to shares of KIC being purchased at $13.25 per share is not directly related to the 1995 ESOP transaction.

Rather, during the same time frame, Foster and Regal were apparently negotiating a separate transaction to purchase stock rights from Knox International Corp. ("KIC"), which is comprised of the former shareholders of MBC. While the KIC transaction was not expected to directly impact F & G's cash requirements, it was discussed in Valuemetrics' Confidential Transaction Memorandum because the KIC transaction was to result in the issuance of another 450,000 F & G shares and an upward adjustment in F & G's goodwill balance.

which the proposed ESOP transaction was discussed, received the August 25, 1995, confidential interoffice memorandum from Dickes discussing due diligence, received a November 2, 1995, memo regarding the closure of MMI, and also received the November 10, 1995, Confidential Disclosure Memorandum prepared for the benefit of the selling shareholders. At the November 14, 1995, meeting at the Country Club, Bartley and Norbutas explained the financial implications of the transaction to the participants. On November 29, 1995, he received a confidential memorandum from Regal noting the decline in the market values of most publicly traded direct marketing companies and indicating that this had influenced the decision process of U.S. Trust and Houlihan Lokey in negotiating the purchase price for the 1995 transaction. Bartley received Valuemetrics' Confidential Transaction Memorandum and then signed the Stock Purchase Agreement containing the same representations that have been addressed in previous Orders.

Again, this general information received by many shareholders prior to the 1995 transaction is not enough to establish constructive knowledge of a breach of trust. He was never a member of the F & G Board, and there is no indication that he ever served on the ESOP Administrative Committee or attended Board meetings. Plaintiffs insinuate that the difference in the due diligence inquiry performed in 1995 from the investigation that was performed with the acquisition of MBC in 1992 should have put Bartley on notice of impropriety. Even assuming that he had some basis to know that the due diligence that was performed by U.S. Trust and its advisors was less than had been performed

with respect to MBC in 1992, Plaintiffs' bald assertion that the scope of due diligence for the stock purchase transaction should necessarily have been of the same magnitude as the due diligence done by the company in preparation for the potential acquisition of a new corporation to be integrated into the F & G family is both nonprobative and logically unsound.

In a further attempt to demonstrate specific knowledge, Plaintiffs point to a February 22, 1995, letter from Attorney John Awerdick, MBC's sweepstakes attorney, to Price Waterhouse, which was copied to Bartley. This letter discloses a December 1, 1994, communication from the North Carolina Attorney General in response to unspecified consumer complaints. The letter also indicates that Attorney Awerdick had responded with the explanation for MBC's belief that it was not in violation of the law and that there had been no further communication or request from the Attorney General's office, which is suggestive of an acceptance of MBC's explanation. The letter goes on to explain some of the existing state and federal regulations of sweepstakes, as well as how MBC's advertisements comply with these laws but might need to be changed in order to remain in compliance if certain changes in the laws should come to pass. At best, this document shows Bartley's awareness of one attorney general inquiry which appeared to have been resolved and the possibility that MBC would need to modify its advertisements if certain regulations were implemented and applied to sweepstakes promotions. Absent further knowledge by Bartley on this subject that has not been demonstrated in the record before the Court, this is not probative of the requisite knowledge.[4] At this stage in

4. Plaintiffs' imputed knowledge theory based on Bartley's appointment of Stuber to act as his representative for purposes of attending the closing on the 1995 transaction is rejected

with respect to the attempt to impute knowledge to Bartley based on the same rationales that have been set forth several times previ-

the litigation, this failure is inexcusable, as assertions without factual support in the record cannot survive summary judgment.

Bartley has submitted an affidavit in which he states: (1) he did not participate in the decision to choose an ESOP stock purchase over the other alternatives that had been presented by Valuemetrics; (2) he did not participate in the actual valuation of shares in connection with the 1995 ESOP; (3) he believed and continues to believe that the historical financial information that was provided to Valuemetrics and Houlihan Lokey was accurate and that the projections prepared represented management's best estimate of future performance; (4) he was aware that actual revenues exceeded those projections for 1995 through 1998; (5) he knew that Valuemetrics and Houlihan Lokey both had and still have outstanding reputations as valuation firms; (6) he declined the opportunity to sell some of his shares in the 1997 ESOP transaction; and (7) he knew that MBC used sweepstakes marketing, but never saw any consumer complaints or inquiries from state attorneys general prior to the start of this litigation. Plaintiffs have offered no evidence rebutting these assertions.

From the information that he received, Bartley was aware that highly qualified and sophisticated firms were involved in investigating, structuring, negotiating, and consummating the stock purchase transactions. There is no indication that he was involved in the decision making processes or was privy to the discussions of the Board or Executive Committee; the only indication of his involvement in the record is that he would provide financial information to Valuemetrics and others involved in the due diligence process from time to time upon request. The record further reveals that he reinvested a significant portion of his proceeds from the 1995

ously in other Orders with respect to other

transaction in F & G, which is suggestive of a lack of knowledge of impending financial catastrophe. Bartley has also stated that he relied on the representations made to him by these outside firms, and Plaintiffs have failed to introduce evidence from which a trier of fact could reasonably determine that this reliance was unreasonable. Plaintiffs' attempt to suggest that all of the selling shareholders, regardless of their positions or level of involvement, had equal access to a "wealth of information" concerning the transactions and the circumstances underlying them belies the inadequacy of their position. Thus, Plaintiffs have failed to make a showing sufficient to survive summary judgment with respect to this particular Defendant.

## IV. *The 1997 ESOP Transaction*

■ Both Stuber and Norbutas also sold shares to the ESOP in the 1997 transaction. It is undisputed that the 1997 stock purchase was funded by a gift to the ESOP for the specific purpose of purchasing the additional shares of F & G stock and that the gift would not have been made for any other purpose. Thus, the 1997 transaction was a no lose proposition for the ESOP, as it allowed the ESOP to increase its majority ownership without incurring any additional debt. As Stuber and Norbutas each had a put right entitling him to sell his shares to F & G for the same price that he received via the purchase by the ESOP, they received precisely what they would have received if they had sold their shares to F & G as originally contemplated, and there is by definition no unjust enrichment. Plaintiffs make no effort to respond to this argument or to refute the factual assertions upon which it is premised. As the constructive trust remedy sought by Plaintiffs is dependent upon proof of unjust enrich-

Defendants.

ment, the Court finds that Plaintiffs are not entitled to the equitable relief sought with respect to the 1997 transaction as a matter of law, and Stuber and Norbutas are therefore entitled to summary judgment on this aspect of Count IX.

### V. *Summary*

In summary, with respect to the 1995 transaction, the Court now finds that when the record is construed in the light most favorable to the Plaintiffs, they have presented specific facts showing that there is a genuine issue of material fact requiring resolution at trial with respect to the knowledge of Stuber and Norbutas. As no reasonable fact-finder could return a verdict in favor of Plaintiffs against Bartley with respect to the 1995 transaction, and he was not involved in the 1997 transaction, he is entitled to judgment as a matter of law. Furthermore, as no reasonable fact-finder could return a verdict in favor of Plaintiffs against Stuber or Norbutas with respect to the 1997 ESOP transaction, they are entitled to judgment as a matter of law on that portion of Count IX.

### CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment by Defendants Bartley, Norbutas, and Stuber [# 416] is GRANTED IN PART and DENIED IN PART. Defendant Bartley is hereby TERMINATED as a party to this litigation.